UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Detroit Coffee Company, LLC,

      Plaintiff,

v.                                     Case No. 18-10688
                                       Honorable Victoria A. Roberts

Soup For You, LLC, d/b/a Detroit
Bold Coffee Co. and Allen James
O'Neil,

      Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT AND
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I. Background

Plaintiff Detroit Coffee Company brings suit against Defendants for federal and New York state law violations arising from an alleged trademark infringement.

This dispute is over Defendants' use of its "Detroit Bold," "Detroit Bold Coffee Co.," and "Detroit Bold Coffee Company DB" marks in connection with their coffee products and related merchandise. Plaintiff argues the use of those marks infringes on its senior "Detroit Coffee" and "Detroit Coffee Company" marks, also used in connection with coffee and merchandise.

1

Plaintiff is a New York based company. It began doing business as Detroit Coffee Company in 2003. It registered a trademark for "Detroit Coffee" for coffee and clothing merchandise in 2013 with the principal register of the United States Patent and Trademark Office ("USPTO").

Initially, Plaintiff was active with its coffee sales and promotion, amassing $22,339 in nationwide marketing expenses and roughly $26,000 in sales with its marks. However, Plaintiff engaged in no active marketing in the past three years; instead relying on promotion via its website, www.detroitcoffee.com, and "word-of-mouth."

Plaintiff's only business in Michigan consists of selling coffee to a Detroit café that closed in 2005, an undisclosed number of online sales in Michigan, and donating coffee to Michigan events sometime before or during 2011. Overall, Plaintiff's sales nationwide consist of approximately $900 in each of the past four years.

Defendants began using the mark Detroit Bold to sell coffee in 2009, and registered "Detroit Bold," "Detroit Bold Coffee Co.," and "Detroit Bold Coffee Company DB" between 2014 and 2016 in the USPTO supplemental register. They sell coffee and other merchandise using the Detroit Bold mark via Amazon, the website www.detroitboldcoffee.com, and several retail stores like Meijer and Plum Market. Defendants market Detroit Bold

via their website, a third-party marketing agency called Karma Jack, social media, the Detroit Eastern Market, advertisements in local Detroit papers, and events in the Detroit area.

In 2016, Plaintiff filed proceedings against Defendants with the USPTO. Defendants say this was the first time they learned of Plaintiff's marks. Later that same year, Plaintiffs filed suit in the Southern District of New York for several trademark related claims. These were transferred to the Eastern District of Michigan. The claims before the Court are:

I. Federal trademark infringement in Violation of 15 U.S.C. § 1114;

II. Unfair competition in violation of 15 U.S.C. § 1125;

III. Trademark dilution in violation of 15 U.S.C. § 1125;

IV. Cybersquatting under federal law 15 U.S.C. § 1125(d);

V. State law trademark infringement under N.Y. GEN. BUS. Law § 360;

VI. Unfair business practices under state law N.Y. GEN. BUS. Law § 349;

VII. Injury to business practices and unfair competition under N.Y. GEN. BUS. Law § 360-L;

VIII. Common Law trademark infringement and unfair competition.

Defendants and Plaintiff filed motions for summary judgment on all of Plaintiff's claims. Defendants' motion for summary judgment is granted; Plaintiff's is denied.

Defendants also filed counter claims for:

I. Cancellation of Plaintiff's trademark due to abandonment;

II. Cancellation of Plaintiff's trademark for being merely descriptive;

III. Cancellation of Plaintiff's trademark for being misdescriptive;

IV. Cancellation of Plaintiff's trademark due to fraud;

V. Violations of Michigan's Consumer Protection Act, M.C.L. 445.903;

VI. Common law trademark infringement; and

VII. Declaratory judgment of noninfringement.

These claims are not raised in these motions and will proceed.

## II. Standard of Review

A motion for summary judgment can be granted under Fed. R. Civ. P. 56 when the pleadings, depositions, answers to interrogatories, and admissions on file show there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). There must be no evidence that would allow a reasonable jury to find for the non-

moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986). Generally, the burden is on the moving party to demonstrate no material fact exists, but that burden may be discharged provided there is an absence of evidence supporting the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). When reviewing a motion for summary judgment, evidence is viewed in a light most favorable to the non-moving party. *Id.*

### III. Analysis

Both parties agree that the analysis of Count I, trademark infringement in violation of 15 U.S.C. § 1125, is dispositive for almost all of Plaintiff's claims, including Counts I, II, VII. As later discussed, it is also dispositive of Counts V, VI, and VIII.

Claims under 15 U.S.C. § 1125 are analyzed in a two-step process. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 728 (6th Cir. 2012). First, the Court determines whether the mark is protectable under the statute. *Id.* Second, the Court decides if the allegedly infringing mark is likely to cause confusion among relevant consumers. *Id.*

Plaintiff says it has a valid and protectable mark, which Defendants dispute in one of their counter claims but do not directly address in their

motion for summary judgment. The parties hotly contest whether Defendants' mark is likely to cause confusion.

A. <u>Protectable Nature of "Detroit Coffee"</u>

Plaintiff asserts that the "Detroit Coffee" mark is protectable because it was registered with the USPTO's principal register. Defendants argue in Count II of their counter claims and in some portions of their motion for summary judgment that the mark is merely geographically descriptive and thus not distinctive or protectable.

A mark is only protected if it is "distinctive" as a matter of law. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007). There are three levels of distinctiveness used to classify marks. *Id.* The first and least distinctive is the generic mark, which is merely the commonly used name of the goods and is never afforded protection. *Id.* The second, called descriptive marks, are marks that directly impart information such as the goods' geographic origin, function or use, intended class of users, desirable characteristics, or effects on the end user. *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 594 (6th Cir. 1989). Descriptive marks may sometimes be protected. *Id.* The third, called inherently distinctive marks, are marks that are "arbitrary,"

"fanciful," or "suggestive" and are always protected. *Leelanau*, 502 F.3d at 513.

Descriptive marks - between generic and inherently distinctive - are only afforded protection if they have developed a secondary meaning among consumers; for example, when the public associates the goods as originating from the mark holder, rather than being merely described as originating from a place. *Id.*

A mark that contains a geographical term can be either merely descriptive or inherently distinctive, depending on whether the geographic term is "minor, obscure, remote or unconnected with the goods." *See Burke*, 871 F.2d at 594. Terms that bear no relationship to the goods or are otherwise not manufactured in the geographic area identified in the mark are inherently distinctive, rather than merely descriptive. *Id.*

Detroit Coffee is inherently distinctive. Detroit is a metropolitan city and not a producer of coffee. Therefore, the geographic term "Detroit" is unconnected to the term "Coffee," resulting in an inherently distinctive mark that is protectable.

Even if the mark is merely descriptive, its registration with the USPTO's primary register creates a rebuttable presumption that the mark has developed a secondary meaning. *Leelanau*, 502 F.3d at 511.

Defendants do not attempt to rebut that presumption, so the mark is protectable either way.

Plaintiff's mark is protectable under 15 U.S.C. § 1125.

## B. Likelihood of Confusion

The parties dispute whether any of the "Detroit Bold" and "Detroit Coffee" marks are confusing to consumers.

The second inquiry is whether a defendant's use of its mark is likely to cause confusion among consumers over which party the goods originate from. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). Confusion is the touchstone of liability for violations of 15 U.S.C. § 1125, and is determined by eight factors:

1. Strength of the senior mark;

2. Relatedness of the goods or services;

3. Similarity of the marks;

4. Evidence of actual confusion;

5. Marketing channels used;

6. Likely degree of purchaser care;

7. The intent of defendant in selecting the mark; and

8. Likelihood of expansion of the product lines.

*Id.* There is no mathematical precision when weighing these factors, and the fact-specific nature of trademark disputes often means not all of the eight factors will be relevant in every case. *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).

The parties contest every factor of confusion; claiming each one either weighs in their favor or is neutral.

### 1. *Strength of the Senior Mark*

The parties disagree over the strength of Detroit Coffee. Plaintiff says the mark is strong because it is registered. Defendants say the mark is weak because it has low consumer recognition as seen by Plaintiff's low sales and lack of marketing.

The stronger a mark, the more likely confusion will result from its infringement. *Daddy's*, 109 F.3d at 280. As a result, stronger senior marks are afforded greater protection. *Id.* The strength of a mark is determined by both its (1) conceptual strength and (2) commercial strength. *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 428 (6th Cir. 2017). Conceptual strength is measured by the mark's distinctiveness: whether it is generic, descriptive, or inherently distinctive as already discussed. *Id.*

Commercial strength depends on the mark's recognition in the marketplace: the extent people associate the mark with the product. *Id.* A mark may be conceptually strong but weak overall due to lack of commercial strength. *Kibler v. Hall*, 843 F.3d 1068, 1074 (6th Cir. 2016). Ultimately, the Court must weigh the mark's conceptual and commercial strength to deduce its overall strength. *Progressive*, 856 F.3d at 430.

A mark can be too commercially weak to outweigh its conceptual strength when it lacks marketing and sales. *Kibler*, 843 F.3d at 1075. For instance, in *Kibler*, the plaintiff advertised his senior, conceptually strong mark via social media, limited appearances in magazines, newspapers, and television shows. It sold roughly 300 albums over the previous three years and 60,000 albums in the past sixteen years. *Id.* at 1074-75. Plaintiff did not produce evidence of how successful his online marketing was. Nor could he explain how widely circulated his appearances in news articles or television shows were. *Id.* Thus, while it was possible to produce evidence of commercial strength despite low sales by providing evidence that the mark was widely marketed, plaintiff failed to do so. *Id.* at 1075-76. The mark was found to be weak overall despite its conceptual strength. *Kibler*, 843 F.3d at 1075-76*; see also Rohn v. Viacom Int'l Inc.*, 706 F. App'x 319,

320 (6th Cir. 2017) (finding mark with uncontested conceptual strength was still weak overall because of its commercial weakness).

The parties here contest different portions of this factor. The Plaintiff relies on the mark's registration with the USPTO, which it says makes the mark conceptually strong. Defendants do not contest the conceptual strength of Plaintiff's mark. Instead they argue it is commercially weak due to low sales and marketing. Defendants prevail on this point.

For starters, Plaintiff's argument is not correct. While registration with the USPTO's primary register grants a presumption of a valid and protectable mark under 15 U.S.C. § 1125, it does not create a presumption of a relatively strong conceptual mark. *Leelanau*, 502 F.3d at 516 (finding mark with presumption of validity was not conceptually strong because it was merely descriptive with a presumed secondary meaning and not incontestable). However, since the Court already determined that "Detroit Coffee" is inherently distinctive, the mark is conceptually strong regardless of what presumption of validity or incontestable status it has.

As in *Kibler* and *Rohn*, Plaintiff's mark is conceptually strong but that strength does not outweigh its commercial weakness. Plaintiff's marketing consists of an appearance in "Business Week" in 2005, non-specific and

sporadic event sponsorships in a few states, world-of-mouth advertising, and the existence of its website.

Plaintiff's word-of mouth advertising and website have an unknown reach. Plaintiff does not divulge how much traffic its site gets, nor does Plaintiff provide evidence of how many people are talking about the mark. Additionally, one can hardly call "word-of-mouth" a form of marketing, which was Plaintiff's sole form of advertisement the past three years.

Lack of marketing, coupled with Plaintiff's small sales numbers totaling 900 dollars or less in the past four years, indicate the mark is too commercially weak for a reasonable jury to find the mark's commercial weakness is outweighed by its conceptual strength, like in *Kibler*.

This factor weighs in favor of Defendants.

## II. *Relatedness of Goods*

The parties dispute the relatedness of the marks. Plaintiffs say the marks are highly related because they are both for coffee products sold over the internet. Defendants refute this, arguing that the parties sell in different markets, which makes the goods unrelated because they merely exist in the same broad coffee industry.

The relatedness of goods is determined by organizing the goods into one of three categories. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 798

(6th Cir. 2004). In the first category, "direct competition," confusion is likely if the marks are sufficiently similar, which is the third factor the court must consider. *Id.* Even if the goods are in direct competition, this factor weighs against the likelihood of confusion if the marks are not similar. *Leelanau*, 502 F.3d at 516.

In the second category, the goods are "somewhat related but not competitive," and the likelihood of confusion will depend on other factors. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).

In the third category, the products are "unrelated" and thus confusion is highly unlikely. *Id.*

Goods are not necessarily related because they exist in the same broad industry. *Homeowners*, 932 F.2d at 1109. Instead, relatedness focuses on whether "goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead customers to believe they come from the same source. . . ." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002). Thus, if the goods or services are marketed to different segments of the population, they do not directly compete. *Id.* If the goods or services are the same and are sold in the same region then they directly compete, even if they are distributed by different means. *Leelanau*, 502 F.3d at 516.

There is no question that the goods are at least somewhat related; both marks are for coffee. The question is whether the goods are in direct competition.

Defendants argue there is no direct competition because Plaintiff only sells products online and, to a limited extent, in person, but Defendants sell online, to physical retailers, and in person. Defendants say this places the parties on different levels of the broad coffee business. In contrast, Plaintiff argues that because both parties sell online there is an overlap in customers such that the goods are in direct competition.

Defendants' argument is misplaced. Their argument is that there is no overlap in how the parties distribute their goods, which is considered later in the fifth factor and does not affect the relatedness of the marks as seen in *Leelanau*. Both marks are for coffee sold online with a national reach and marketed to everyone. This places the parties in direct competition.

However, because the Court later concludes the marks are not similar, this factor weighs in favor of Defendants.

### III. *Similarity*

The parties contest how similar their marks are. Plaintiff states the marks are similar because they share similar wording and emphasis on the

word "Detroit." Defendants argue the marks are dissimilar because they differ in appearance when viewed in market conditions.

The similarity of the marks is given considerable weight. *Daddy's*, 109 F.3d at 283. To determine similarity, courts must analyze the "pronunciation, appearance, and verbal translation of conflicting marks." *Id.* Marks should not be compared side-by-side as they might be shown in the courtroom. *Homeowners*, 932 F.2d at 1106. Instead, courts determine whether the marks would confuse the public when viewed alone, as some sufficiently similar marks may confuse consumers that do not have both marks before them when in market conditions. *Daddy's*, 109 F.3d at 283. Additionally, courts are not permitted to dissect the marks, since they must be considered in their entirety with the focus on their overall impressions, rather than their individual features. *AutoZone*, 373 F.3d at 795. Where the differences between the marks are significant and outnumber the similarities between them, the likelihood of confusion is small. *Leelanau*, 502 F.3d at 517.

Plaintiff argues that the word "Detroit," in the "Detroit Bold" and "Detroit Coffee" marks makes them sufficiently similar because it is the first word in the mark and highly emphasized. Defendants contend that the

marks are dissimilar because they have unique stylistic appearances when presented at market.

When viewed in market conditions, the marks are not similar. Merely taking the term "Detroit" in isolation as Plaintiff encourages would be dissecting the marks for similarities, which is not permitted. Instead, viewing the marks on the whole as they appear in the marketplace, the dissimilarities between the marks are significant and far outnumber the similarities. The marks have dissimilar fonts, colors, and overall stylistic impressions originating from their shape, lettering, and capitalization. Additionally, in "Detroit Bold" the emphasis is placed on "Bold," as it appears with significantly more prominence on the mark than "Detroit," which is the opposite of the relationship between "Detroit" and "Coffee" in the plaintiff's mark.

Effectively, the only similarity between the marks is the use of the word "Detroit." When viewed in light of the numerous dissimilarities, this is not significant enough to allow a reasonable jury to find the marks are similar even when viewed independently in a market setting.

Defendants' "Detroit Bold Coffee Co." and "Detroit Bold Coffee Company DB" marks, are also not significantly similar to plaintiff's marks. While these marks contain the additional terms "Coffee" and "Company"

that appear in Plaintiff's marks, they retain all the mentioned dissimilar characteristics.

When viewed as a whole in market context, all of the marks are dissimilar. This factor weighs in favor of Defendants.

IV. *Evidence of Actual Confusion*

Plaintiff offers evidence of actual confusion between the marks and says this weights this factor weigh in its favor. It points to four potential instances of actual confusion. The examples of confusion include (1) a pair of voicemails sent by a customer asserting that he ordered Plaintiff's coffee from Amazon for shipment to his Michigan home and it did not arrive when expected, (2) an email sent to Plaintiff inquiring if he had reached the email address of "A.J.," (3) an email sent to Plaintiff asking if it has a store, and complimenting the coffee bought at Eastern Market, and (4) an email stating the customer bought coffee at Eastern Market.

Defendants say these examples are not probative of actual confusion; they claim this was merely evidence of isolated instances of confusion made by customers unfamiliar with the parties' products, which should make this factor neutral.

While the likelihood of confusion is most strongly shown by examples of actual confusion, *Daddy's*, 109 F.3d at 284, evidence of actual confusion

is not required to demonstrate a likelihood of confusion, and a lack of actual confusion is rarely significant. *Progressive*, 856 F.3d at 433. Isolated instances of actual confusion are not weighty enough to support a finding that confusion is likely. *Id.* Furthermore, confusion that is brief and occurs among individuals that are unfamiliar with the products is entitled to considerably less weight than chronic mistakes. *Therma-Scan* 294 F.3d at 634.

In *Therma-Scan*, there were 18 instances of consumers contacting the wrong company, but only 6 of them were relevant to confusion. *Id.* The six relevant emails were those that showed confusion about the companies' products by attributing the incorrect product to the plaintiff. *Id.* While even a single instance of confusion could at least support the likelihood of confusion, the weight of that support was so diminished it was legally insignificant. *Id.*

Three factors helped make that decision: (1) the size of defendant's operation was large with several million units sold, (2) the email format of the inquiries meant the confusion could have originated from mere carelessness among consumers, and (3) the emails were sent over a limited time-frame of two years despite both products co-existing for longer. *Id.*

The support that the six emails provided for the likelihood of confusion was legally insignificant. *Therma-Scan* 294 F.3d at 634-35*; see also Progressive*, 856 F.3d at 434 (noting that courts generally decline to give probative weight to isolated instances of actual confusion).

Plaintiffs have not produced legally significant evidence of actual confusion. Like in *Therma-Scan*, the two emails and the voicemail that mention coffee are relevant to confusion because they demonstrate customers attributing the incorrect product to Plaintiff. The email about "A.J." has nothing to do with coffee. Also like in *Therma-Scan* – these three incidents of confusion are likely the result of careless consumers, rather than chronic confusion among purchasers.

While Defendants are not selling millions of coffee bags comparable to *Therma-Scan*, they are engaged in a significant amount of business such that three instances of confusion are unlikely to be significant in light of their operations. It is unclear what time period this confusion spans, but it began in 2012 at the earliest and the marks have co-existed since 2009.

While these three instances of confusion do support the likelihood of confusion, that support is legally insignificant. This factor is neutral.

V. *Marketing Channels Used*

The parties disagree on whether the marketing channels used for their marks are the same. Plaintiff argues that both parties sell over the internet, which generates a significant overlap in the marketing channels and makes this factor weigh in its favor. Defendants refute this. They say there is no overlap because of the Plaintiff's low sales and the differences in amount and type of the marketing conducted by the parties.

When considering marketing channels used by the parties, courts examine "how and to whom the respective goods or services of the parties are sold." *Leelanau*, 502 F.3d at 519. When goods are sold via different avenues, there is less likelihood of confusion. *Id.* The same result occurs if the parties have different customers and market their goods or services in different ways. *Therma-Scan* 294 F.3d at 636. This factor significantly illuminates what happens in the marketplace, and is thus most helpful when other factors are not. *Id.*

Just because two parties market their goods on the internet does not mean they use common marketing channels. *Progressive*, 856 F.3d at 435. Instead, where overlap on the internet is in question, the court examines (1) whether the parties use the internet as a substantial marketing channel, (2) whether the product is web-based, and (3) whether the parties' marketing channels overlap in other ways. *Kibler*, 843 F.3d at 1079. Additionally,

sophisticated advertising programs are "quite different" from less sophisticated ones. *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987). And, inevitable overlap in local and national advertisements does not significantly increase the likelihood of confusion. *Daddy's*, 109 F.3d at 286.

There is no significant overlap in marketing channels between the parties. While both parties sell coffee over the internet, this does not generate a significant overlap.

First, the goods are sold via different avenues. Plaintiff sells almost exclusively via its website; Defendants sell their goods via Amazon, retail chains, Eastern Market, and their website. Second, the marketing used by the parties differs in sophistication and methodology. Defendants market their goods via a marketing agency, social media, events in the Detroit area, and Detroit based newspapers. Plaintiff relies almost entirely on "word-of-mouth" marketing, which is less sophisticated. Third, the parties sell to different customers. While both parties sell coffee, Plaintiff has a limited online customer base. Thus, it is unlikely a customer would ever encounter both products.

Finally, the marketing done on the internet does not generate significant overlap because (1) the Defendants market their products by

other means, (2) the products are not internet-based, and (3) there is little marketing overlap via other means.

The Court finds that the parties sell goods to different people in different ways. This factor weighs in favor of Defendants.

## VI. *Likely Degree of Purchaser Care*

The likely degree of purchaser care is contested by both parties. Plaintiff says that the likely degree of care is low because coffee is bought on impulse with a casual attitude and little care. Defendants disagree; they say the likely degree of purchaser care is too variable to be useful.

The general prediction of whether confusion is likely is based on the standard of an ordinary buyer exercising ordinary caution. *Progressive*, 856 F.3d at 435. If customers are likely to exhibit a higher degree of care, then the likelihood of confusion is diminished. *Id.* This generally occurs when the goods in question are expensive or have a particular expertise associated with them. *Homeowners*, 932 F.2d at 1111. If the goods are cheap to the point where a purchaser exhibits a casual degree of care that could result in "impulse buying," then the likelihood of confusion is greater. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982) (finding fast-food items were subject to impulse buying).

Where the range of consumer care varies, the likely degree of purchaser care does not greatly affect the likelihood of confusion. *Kibler*, 843 F.3d at 1081 (finding that purchasing music on iTunes would be done by consumers with a varying degree of care and thus the likely degree of purchaser care is not helpful); see also *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188-89 (6th Cir. 1988) (upholding that likely degree of purchaser care was unhelpful in the context of a 15 dollar car care product).

Plaintiff argues that coffee is akin to a cheap, impulse buy item like fast food and thus consumers are unlikely to exhibit care when purchasing it. Defendants contend that the factor is unhelpful and thus neutral.

The likely degree of purchaser care is not helpful in this case. Unlike in *Frisch*, the coffee sold is not as cheap as fast food or subject to a universally casual consumer attitude. Its price ranges between the fifteen and forty dollar mark per bag. Additionally, while some coffee consumers adopt a casual attitude in deciding what coffee to drink, others care deeply. This spectrum of price and consumer attitude makes it difficult to ascertain the level of likely consumer care, and the Court finds this factor is unhelpful.

This factor is neutral.

VII. *Defendants' Intent in Selecting the Mark*

23

Plaintiff claims that the Defendants intentionally copied their mark. Plaintiff says that Defendants adopted their mark after Plaintiff, which would put Defendants on constructive notice of Plaintiff's mark. Plaintiff contends this means Defendants knew of Plaintiffs mark and thus had an intent to copy. Defendant simply says it did not know of Plaintiff's mark and thus could not have intentionally copied it.

Intent in a trademark action is relevant because purposefully copying the plaintiff's mark demonstrates a belief that the mark will divert business from the senior user. *Daddy's*, 109 F.3d at 286. Evidence of intent must be either direct or circumstantial that the defendant initially selected the mark to attract plaintiff's customers. *Id.*

Evidence that the contested mark was used with knowledge of the protected mark can support an inference of intentional copying. *Id.* An extensively advertised and long-used mark can create a presumption that the alleged infringing party knew of the mark. *Id.* But the mere prior existence of a registered mark does not demonstrate intentional copying. *Id.* at 286-87.

Plaintiff provides no support for the notion that registration with the USPTO provides constructive notice, or that constructive notice is sufficient to establish Defendants knew of the senior mark prior to using the

contested mark. That notion contradicts the Sixth Circuit's position that the mere prior existence of the registered mark does not demonstrate intentional copying. Further, Defendants began using the mark in 2009, several years prior to the registration of Plaintiff's mark in 2013 when the supposed constructive notice would have been given.

There is also insufficient evidence to establish that Plaintiff's mark was long-used and extensively advertised in 2009, and there is not a substantial similarity between the marks that creates an inference of intentional copying. Plaintiff's argument is untenable.

There is no direct or indirect evidence to show that Defendants knew of Plaintiff's mark at the time they began using it, making this factor neutral.

## VIII. *Likelihood of Expansion*

Defendants argue that neither party shows a strong possibility of expansion. Plaintiff argues this factor weighs in favor of confusion because the parties already compete.

A strong possibility that either party will expand its business to compete with the other or be marketed to the same customers weighs in favor of finding that the present use will likely cause confusion. *Daddy's*, 109 F.3d at 287. The expansion can be either geographic or related to the products or services offered. *Id.*

Neither party argues that there is a strong possibility of either form of expansion.

This factor is neutral.

## IX. *Balance of Factors*

All eight factors are either neutral or weigh in favor of finding that there is no likelihood of confusion. This leads to the conclusion that confusion is unlikely. However, Plaintiff argues that the court should not weigh factors that consider the size of its sales or marketing budget against it. It contends this approach dooms small businesses and renders their marks unenforceable against larger entities.

Current law demands that sales, marketing budgets, and other indicators of a business's size be accounted for in certain factors because they affect the likelihood of confusion.

As such, the Court finds that no reasonable jury could conclude that confusion between the marks is likely.

## C. Effect on Plaintiff's Claims

That confusion is unlikely directly affects most of Plaintiff's claims. A likelihood of confusion is required to sustain a claim of federal trademark infringement under 15 U.S.C. § 1114, a claim of unfair competition in violation of 15 U.S.C. § 1125, and a common law trademark infringement

claim. *See Progressive*, 856 F.3d at 422. The finding of no likelihood of confusion resolves Counts I, II, and VIII in favor of Defendants.

There are several related New York state law claims before the court. The test for confusion is the same under New York state law as it is for federal law; confusion is required to sustain a claim for trademark infringement under N.Y. GEN. BUS. Law § 360. *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 367 (S.D.N.Y. 2009). The same is true for unfair competition under N.Y. GEN. BUS. Law § 360. *Codename Enterprises, Inc. v. Fremantlemedia N. Am., Inc.*, No. 16CIV1267ATSN, 2018 WL 3407709, at *13 (S.D.N.Y. Jan. 12, 2018). Confusion is also required to sustain a claim of injury to business reputation under N.Y. GEN. BUS. Law § 360-L. This resolves Counts V and VII in favor of Defendants.

Count VI, unfair business practices under N.Y. GEN. BUS. Law § 349 requires a showing that Defendants (1) conducted a consumer-oriented act, (2) the act was misleading in a material way, and (3) plaintiff was injured by the act. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000). The act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* In asserting that the act was misleading, Plaintiff relies solely on the argument that confusion is likely. Since

confusion is unlikely, a reasonable consumer would not be misled. The court decides this Count VI in favor of Defendants as well.

## D. Plaintiff's Dilution Claim

Defendants argue that Plaintiff's dilution claim should be dismissed because it has not shown the Detroit Coffee marks are famous.

Count III, trademark dilution in violation of 15 U.S.C. § 1125(d) requires that the senior mark be (1) famous and (2) distinctive, while the junior mark must be (3) used in commerce (4) subsequent to the senior mark becoming famous, and (5) cause dilution of the distinctive quality of the senior mark. *AutoZone*, 373 F.3d at 802.

A mark is famous when it is widely recognized by the general public of the United States as a source of the mark owner's goods. *Kibler*, 843 F.3d at 1083. To decide if the mark is widely recognized enough to be famous, the court must analyze (1) the duration, extent, and reach of advertising and publicity around the mark; (2) the amount, volume, and extent of sales; and (3) actual recognition of the mark. *Id.* The Court should find the mark is a "household name," and it is easier to demonstrate a mark is commercially strong than it is to establish it is famous. *See id.* (finding it is more difficult for a mark to be famous than to achieve public recognition required to establish strength in a likelihood of confusion test).

As previously discussed, Plaintiff fails to establish that its mark is even commercially strong. The Court's earlier discussion encompassed the sale, marketing, and actual recognition of the mark in making that decision. The mark does not rise to the level of public awareness required to be famous.

Summary judgment is awarded to Defendants on Count III.

### E. Plaintiff's Cybersquatting Claim

Defendants claim that Plaintiff cannot sustain its claim of cybersquatting because it fails to show its mark is distinctive or famous and that Defendants acted with a bad faith intent to profit from Plaintiff's marks. Plaintiff says its claim should proceed because Defendant had a bad faith intent to profit from its marks and the domains used by the parties are similar.

Plaintiff's Count IV is for cybersquatting in violation of 15 U.S.C. § 1125(d). A successful claim for cybersquatting requires that the trademark owner asserting the claim show (1) he has a valid trademark entitled to protection, (2) the mark is distinctive or famous, (3) the defendant's domain name is identical or confusingly similar to the mark or, in cases of famous marks, dilutive of the mark, and (4) the defendant used, registered or

trafficked in the domain name, with (5) a bad faith intent to profit. *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004).

For the third factor, domain names that incorporate an entire mark are normally confusing; consumers might think the domain name is used, approved, or permitted by the mark holder. *Id.* at 206. Additionally, slight changes to a domain name, such as generic or minor words, are irrelevant. *Id.*

For the fifth factor, courts consider nine factors as outlined in 15 U.S.C. § 1125(d)(1)(B)(i) when determining a bad faith intent to profit. *Id.* They include:

1. Defendant's trademark or other rights to the domain name;

2. Whether the domain name consists of someone's legal name;

3. Defendant's prior use, if any, of the domain name to offer bona fide goods or services;

4. Defendant's bona fide noncommercial or fair use of the mark;

5. Defendant's intent to divert customers from the mark owner's site either for commercial gain or in an attempt to tarnish or disparage the mark;

6. Defendant's offer to transfer, sell, or otherwise assign the domain to the mark owner or third party for financial gain without having used the domain for bona fide goods or services;

7. Defendant's use of material or misleading false contact information when applying to register the domain name, intentional failure to maintain accurate contact information, or prior conduct indicating a pattern of such behavior;

8. Defendant's registration or acquisition of multiple domain names that are confusingly similar to the mark;

9. How distinctive or famous the Plaintiff's mark is.

*Id.* at 206-07. These factors should be considered in their entirety. *Id.* at 207.

Defendants do not contest that their domain www.detroitboldcoffee.com is confusingly similar to Plaintiff's www.detroitcoffee.com. Instead, they argue that the "Detroit Coffee" mark is neither distinctive nor famous and that there was no bad faith intent to profit from the similar domains.

As already discussed, the "Detroit Coffee" mark is inherently distinctive. However, the nine factors of bad faith do not indicate that there was a bad faith intent to profit from the similar domain names. Defendants began using the mark "Detroit Bold" prior to learning of Plaintiff's mark, which indicates they did not intend to divert customers from Plaintiff's website. Defendants (1) used their domain to sell bona fide goods, (2) did

not offer to transfer or sell the domain to Plaintiff or a third party, (3) did not hide their involvement in registering the domain, or (4) register multiple, similar domains. Plaintiff's mark, while distinctive, is not widely recognized or famous.

While the Defendants did not use the domain in connection with a legal name, and did not register their marks until several months after their domain, those two factors alone do not indicate a bad faith intent. In all, there is insufficient evidence for a reasonable jury to find Defendants' acted with a bad faith intent to profit from the similarity between the domain names.

Summary judgment is awarded to Defendants on Count VI.

## III. Conclusion

Defendants' motion for summary judgment in their favor is **GRANTED** in its entirety. Plaintiff's motion for summary judgment is **DENIED**.

This case will proceed on Defendants' counter claims only.

**IT IS ORDERED.**

S/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: 08/21/2019